## John Gruninger *v.* Pauline Gruninger, Appellant.

*Divorce—Adultery—Evidence —Confessions—Letters to and from co-respondent.*

A divorce will be granted on the libel of a husband against his wife charging adultery, where the husband testifies to a confession made to him by his wife, and his testimony in this regard is corroborated by three other witnesses, who testified that she had admitted the intimacy charged in the libel, and also admitted that she had so confessed to her husband, and where letters between the respondent and co-respondent, properly identified, show on their face enough to establish an unlawful intimacy.

Argued April 7, 1898.    Appeal, No. 76½, Jan. T., 1898, by respondent, from decree of C. P. No. 3, Phila. Co., March T., 1896, No. 4, granting divorce.    Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and FELL, JJ.    Affirmed.

Libel for divorce.

The master, Alexander Colesberry, Esq., made the following report:

From the evidence taken in this case, which was very voluminous, the master reports as follows : That the libellant and respondent, whose name was Pauline Kaelenberg, were married on December 30, 1875, by the Rev. Mr. Spaeth, at his house, and that they lived happily and contentedly together until some time in 1882, or the early part of 1883. To this marriage were born two children—John W. Gruninger, aged nineteen, and Herman Gruninger, aged sixteen, both born prior to 1882. About this time the libellant called in the co-respondent as a family physician, he having been acquainted with the respondent prior to their marriage. During this period numerous events occurred between the respondent and the co-respondent which excited the suspicions of the libellant. According to his testimony, they consisted principally of his long visits to her during her illness, claiming that internal examinations were necessary to be made by him, and that other parties were not present; long and secret interviews in the parlor which, when interrupted by him, would take the form of ridiculous questions and ridiculous answers, with sudden changes of subject; sitting in the bay-window and watching for him, the co-respondent, to pass, and affectionately waving her hand. These thing so harassed and worried the libellant, that he requested the doctor to discontinue his visits professionally to his house. About this time, on one occasion, the libellant met the co-respondent casually in the street, and was informed by him that he had just paid a visit of two hours to the respondent, and upon his returning home and questioning her, she positively denied that any person had visited her, which called forth from the libellant the remark, which was ebullition of anger and rage, "You are a —— liar."

This certainly indicated, and these allegations are not materially denied by the respondent, that a very unhappy state of affairs existed in this family.

Now, on or about this time the respondent made a visit to New York, and upon her intending to return home, she wrote to her husband announcing the time. However, before this period, the respondent obtained from the carrier a letter addressed to her at New York (according to his testimony) by the co-respondent, which contained "Dearest" and "Dearest Pauline," and "nothing but love" in it, and appointed a meet-

ing with her upon her arrival in the city, when they would go
to a hotel.   This letter he closed and forwarded to her, and
immediately took steps to intercept this assignation by being
present, with himself, his brother and a sergeant of police, at
the Ninth and Green streets station at the time of her arrival
stated in the said intercepted letter.

It will be observed here that the natural route which the re-
spondent would take to reach her home would be by the Penn-
sylvania Railroad, which runs through Frankford, and not by
the Reading Railroad, which comes by way of the North Penn,
and which landed her some miles from her home.

The libellant and his brother and the sergeant saw her arrive,
and two of them testify that she lingered around the station for
a long period, and one for an indefinite period, and that after
she left the co-respondent appeared upon the scene, and that a
violent altercation took place between him and the libellant.
Subsequently the libellant and respondent had violent words,
both at a minister's house and at their own home, in relation
to this matter.

In explanation of the relations which existed between the
respondent and the co-respondent at this time, it might be well
to anticipate the evidence hereafter to be discussed by introduc-
ing at this stage a letter written by the co-respondent to the re-
spondent on July 30, 1883, which is admitted as evidence and
marked exhibit " F."   This letter was not delivered, but un-
doubtedly intercepted.   There are various letters in this case
which will be connected chronologically, and with each there
is an explanation of their date and by whom and to whom
written.   The manner of their presentation before the master
will be more fully explained as this report proceeds.   Here
follows exhibit " F," with the explanations as made by the
counsel for the libellant, which, in this and all other letters,
has been mostly adopted as the views of the master:

### EXHIBIT " F."

" July 30th, 1883.

" MY DEAR PAULINE—

" The Mrs. is engaged for a few minutes with the dressmaker,
and I expect to see Mrs. C this evening, at her mother's, so she
can hand this tomorrow—I have only sufficient time to reiterate

my feelings of unalterable devotion to you **(1)**—and I beg your pardon for the sentence I allowed, in my desperation to creep into the Brown letter—Even then I reconsidered it immediately —How are things with you. I should like very much to hear from you through the same channel as before : When the opportunity arrives I shall write the satisfactory letter and when an opportunity for a meeting offers send me word immediately. **(2)**—What did you mean by saying I have explained everything to J ?—**(3)**

" And shall I write that letter to J—I hear them coming **(4)** —Adieu—

                         " Ever yours,

                                  " A."

The handwriting of this letter is identified and its authenticity is not denied by the co-respondent. He merely says he did not send it, which is evident, and the manner of its being slyly snatched by his wife when he thinks her asleep is accurately prophesied in exhibit "D," while the possession of this letter by his wife is alluded to in exhibit "B." His explanation that he knew other women named Pauline, but never wrote them such letters, is absurd.

**(1)** This letter, written by a married man to a married woman, was characterized by the co-respondent's counsel as "merely platonic." It was exhibited to co-respondent and his counsel by Messrs. Work and DeHaven, and handed back with the remark that it was years old and did not amount to anything.

**(2)** Assignation requested. Yet it is argued they could meet at any time in an innocent way as physician and patient.

**(3)** Libellant testified that at this period respondent explained to libellant that co-respondent had gone no further than to hug and kiss her.

**(4)** Surreptitious nature of this correspondence is indicated by the writer abruptly closing upon approach of other inmates.

The explanation of the respondent as to her going by the Reading Railroad to Ninth and Green, instead of by the more direct route to Frankford, is that she desired to see the scenery ; and the co-respondent's explanation why he happened to be present at the station on that day, is that he went to see his sister off to Chestnut Hill, where she resided. It is manifest to the master that the libellant could not have obtained the information of his wife's intention of coming home by way of Ninth and Green, except through the intercepted letter ; and so, taking into full consideration this letter and the letter dated July 30, 1883, exhibit " F," if said letter " F " had been known to the libellant at that time, and the assignation at the station had

been fully completed by the parties repairing to a hotel, and an action of divorce had been commenced and prosecuted, it is absolutely and undoubtedly clear to the mind of the master that the case then would have been brought within the authorities as laid down in Loveden v. Loveden, 2 Haggard's Rep. 2; Grant v. Grant, 2 Curteis's Rep. 57; Matchin v. Matchin, 6 Pa. 332.

The libellant at this period had two young boys, and being without absolute proof of the infidelity of the respondent, and having interrupted the full commission of the intended assignation, and also being ignorant of the full extent of the affection which must have existed between the parties to call forth the letter of July 30, 1883, he in the kindness of his heart condoned this offense and, as stated by him, he would try to live it down.

Nothing further seems to have occurred to arouse the slumbering suspicions of the libellant, which appears to have existed all through this period, by the evidence of the respondent as to his continually nagging her on this matter, until February 19, 1894, when the libellant surprised the respondent by discovering that the reasons given by her for her visiting the city, and remaining out until 7 o'clock at night, were untrue. On February 19, 1894, the respondent went to town with two women relatives; she was away from them for some hours while in the city and, arriving home as late as 7 o'clock at night, she concocted a falsehood to be told her husband, to the effect that she had been to her sisters', including both women to lend color to it; he learned that she was not at her sisters' and charged her with deception, saying, "I know where you were," to which she replied, "For God's sake if you do, don't disgrace me." It is evident that there was a period during that day of February 19 which the respondent has not accounted for truthfully, and did not wish to be accounted for, and that the sudden accusation of her husband alarmed her to the extent of making this virtual confession. This is what may be termed the first confession, and is corroborated by the testimony of Mrs. Balz.

From this time on, however, the libellant, with almost childish guilelessness, somewhat touching in its nature, tried to defend his home and his honor and save family disgrace, by adopting some means of keeping the respondent at home; forbidding her to leave or go into the city without an escort for the six days

of the week, and allowing her to go on Sunday, and this is shown
not only by the libellant, but by the respondent also in her letter.

Now the master brings into this case the following letters
written by the respondent to the co-respondent, and they are in-
troduced here to show the exact relations of the parties to each
other at this time, and, as said before, the comments upon these
letters as exhibited to the master, are the only deductions that
can be drawn from the language, remembering that they are
from a married woman to a married man.    If the letters had at
that period been known to the libellant, these circumstances,
taken in connection with the deception of February 19, 1894,
and the previously described and condoned liason of 1883, there
could be no doubt in the mind of the master that adultery may
be presumed to have been the outcome of such love, devotion,
frenzy and secrecy as is contained in these documents.    The
counsel for the respondent has tried to explain them in argu-
ment as love tales, and to belittle their importance, and the re-
spondent has not denied them with such positiveness as would
prevent the master from coming to the undoubted conclusion
that she did write them, when her handwriting is positively
sworn to by the libellant, by Mrs. Balz and the two sons of
the libellant, and her own admission to a question of the mas-
ter, that they looked like her handwriting.    There is no doubt,
therefore, in the mind of the master, but that they were written
on the dates named, and that they were addressed to and re-
ceived by the co-respondent.    In proof of this latter fact, we
must look at the internal and external evidence in the case,
and keep in mind not only these letters, but all the circum-
stances affecting the relations of these parties in 1883, and the
confession of the respondent of 1894; remembering one cause
of complaint as stated by the libellant in his own testimony,
and also by his remarks to Mr. Lukens was, that he suspected
the co-respondent of buying tickets for his wife's sister to Chi-
cago, which indicated the presentation to her of a present.    This
fact is stated in one of the letters, and as there is no other party
in the known world who was connected with the respondent in
this "ticket affair" but the co-respondent, the co-respondent
could be the only one meant.    Again we find in one of the let-
ters, that the respondent speaks of an interview with the co-
respondent's wife, in which she states that she has a letter from

twelve years ago; this letter is exhibit "F," and is a letter from the co-respondent to the respondent. To whom would she confide this important secret but to the co-respondent? Then again we have the evidence of Mr. Work and Mr. DeHaven, two honorable members of the Philadelphia bar, which, as it bears strongly upon the identification of the co-respondent with these letters, the master will give more in detail. Here follow the letters:

### Exhibit "B."

"14th.

"I want to see you.

"I would like to be with you but it is best so (I think.) A. (**6**) believes if I let you alone—you will be good and kind to her. Do you know sometimes there is a remorse comes over me—Then again you have told me you never lived happy with her— (**7**)

"I only ask you to believe me to be true and never mistrust me—. I have not been in town alone until last Sun. I went to see my aunt I got in at Frankford Station and out at Powelton Ave—I have only been in the city twice since I saw you last, then I went in with E. L. (**8**) on the Reading (**9**) returning the same way I do not go anywhere unless I have a protector with me except Sun. Aug. (**10**) tells me you cannot get off so easy on that day (**11**) Mrs. B. has certainly made a great mistake she has not seen me at any station much less at the Junction—I have told you before not to believe what you hear, only what I tell you and what you see yourself. I have heard numerous tales about you it does not affect me in the least. I have placed such confidence in you no matter what I hear would prove nothing to me. I believe you to be true to me alone and whatever kind act of deed You do towards any one, even to give the widow's children Xmas or Easter presents—(there is a motive in it) I have your love and that I rely upon. This morning coming home from church I saw you go in the Mansion (**12**) did you see the flower carnation in the back parlor window) and was very much disappointed not to meet you or pass you —(*When I got closer to our house I saw white sleeves through the bay—found it was Aug. You might know what a pleasant Easter Sun*—(**13**) *I had. He has not spoken a word. The pot will boil over in a day or two. (Such a life) What will*

*I do? Should I leave again?*) Do you think A. knows anything? Aug. tells me she, A., knows you got tickets but returned the Pullman's (14). That is all I am afraid of. My sister, she will never betray me. She would swear against him. I have her word for it; in fact she knows nothing, and I never saw the tickets—A allows she has a letter from twelve years ago—(15) I told her that was unmaterial to me. She then said you acknowledged it only what my husband tells me you have something in black and white (16). She thought she would catch me and have proof—She is sly. If she has your driver posted they will soon know who delivers the letters as he saw W. and I together to-day. I wish you would meet her somewhere else, although she did not go to see you with my consent. I thought you would find a way to send me a letter or two without her. I have been so impatient the last week because I heard nothing of you. I went to Graff's; thought perhaps she might have heard something of you, for an excuse I returned a letter that she gave me from Johnson (17). I must close, the boys (18) have company in the parlor and are calling me. O, if I could only see you one moment, I feel just as you do but dare not express myself—Yours forever. If you could only help me."

This letter was written Easter Sunday, April 14, 1895, which is shown as follows: It is the only Easter Sunday in many years which fell on the 14th of any month (the almanac proved itself, Wilson v. VanLeer, 127 Pa. 371), and it was written after the starting of the Reading Railroad Terminal, from which trains began to run on July 2, 1894, and after the writing of the Johnson letter, which is dated December 24, 1894.

(6) The context of the letters shows that " A " is a cipher used to designate the wife of the person addressed.

(7) When a woman writes to her paramour that she feels remorse because his wife believes that her attentions to the man prevents his being kind to his wife, yet comforts herself with the reflection that they never lived happily anyhow, it seems scarcely necessary to gravely discuss the nature of their relations. Remorse is a strong word applied to marital infelicity by the person causing it.

(8) E. L. is undoubtedly Eliza Lukens or Miss Clothier.

(9) The Reading to Frankford started July 2, 1894.

(10) The context of the letters shows that " Aug." is used to designate the writer's husband.

(11) Libellant told his wife that co-respondent could not get off on Sunday.

(12) There is a place near the parties' house known as the " Mansion."

(13) The letter being written on Easter Sunday subsequent to the open-

ing of the Reading Railroad to Frankford on July 2, 1894, and being dated "14th," the almanac (which proves itself, Wilson v. VanLeer, 127 Pa. 371) demonstrates the date to have necessarily been April 14, 1895.

(14) Gruninger told his wife that Mrs. Boyer had told him that she saw tickets which Mrs. Gruninger and Dr. Boyer had purchased for Chicago on February 19, 1894, but that the two Pullmans were missing. Mrs. Gruninger's testimony curiously corroborates this. Again Mrs. Bihm says Mrs. Boyer told her she had found or seen these tickets in her husband's pocket.

(15) Mrs. Boyer told Gruninger that she had a letter twelve years old, and Mrs. Gruninger also told him that Mrs. Boyer had so stated to her, and the letter itself is produced and in evidence, exhibit "F."

(16) Mrs. Gruninger testifies her husband said there was something in black and white.

(17) Mrs. Gruninger borrowed of a Miss Firesinger, whose mother's name is now Graff, a foolish love letter from one Johnson. She returned it as stated in this letter. Gruninger then borrowed it and it is now offered in evidence. These facts are proved by Gruninger, Miss Firesinger, Mrs. Graff and the Johnson letter which is dated December 27, 1894.

(18) Mrs. Gruninger has two boys.

### EXHIBIT "A."

"23d.

"You have no idea how I miss hearing from you. When Saturday night comes I have made up my mind not to see you for a time it makes me feel sad and lonely. I do hope and pray there will be a change for the better this year, I have gone through so much hardship in the last two weeks and wonder that I put up with it.

"All for the love I bear thee."

"25th.

"For the last few days Aug. had the toothache about two A. M. I got up took a piece of cotton out of the pill of three box you sent me (interrupted here) put a few drops oil of cloves on it then crowned the tooth and he went to sleep soon after (19). (Dear me you just flew around the corner and I am not able to talk to you or see you 10.50 A. M.) what if he knew you had handled the cotton—(Why so early to-day, where are you going in the anxiety.) Yours. 26th, 3 P. M."

"*Aug. torments the life out of me; really sometimes I think any living would be better than this*—Saturday Aug. said Herman (20) might go to town with me, I got up early had my work and baking all done by nine E. L. was to go with us—Herman never made his appearance until twelve. Aug put him at work in the shop (21)—So I prepared dinner Just as you came around

the corner.—(Sat.) Will came in for lunch—*When Aug. came home at twelve he sat down ate his dinner (not a word was said) after he was gone I sat down and cried,* When Eliza Lukens walked in (22) said 'Cheer up we will go off somewhere,' so she helped me with my dishes and we were in town by two30 purchased one of the thirty-five dollar coats (reduced to fifteen) returned in the 3.35 R. T. (23) no one is the wiser the coat was sent to E. L. (24)

"Love—I love thee—I am sad with the want of thee—
                                          "Yours,

"Dr. Please destroy all letters."

This letter was written Tuesday, April 23, and Thursday, April 25, 1895, which is shown as follows :

The 3:35 train to Frankford ceased running April 25, 1895. The calendar shows that the last Saturday it ran was therefore April 20.

The toothache referred to began on Easter Sunday, April 14.

(19) Gruninger had a toothache which began Easter Sunday, April 14, 1895, and his wife applied cotton with oil of cloves upon it.

(20) Herman is her son's name.

(21) The circumstance of the boy being put to work in the shop is corroborated by Gruninger and Herman.

(22) Eliza Lukens is Eliza Webb Clothier.

(23) The 3:35 train to Frankford from the Reading Terminal ceased running April 25, 1895. The calendar shows that the last Saturday it ran was therefore April 20, 1895.

(24) Herman Gruninger (Gruninger's son) subsequently brought this coat over from Eliza Lukens to his mother.

EXHIBIT "C."

"21st.

"As usual you had a letter ready for me when W. came. I was almost afraid you had not expected her so soon I am pretty well over the fright. But I cannot think of seeing you very soon I am sure if we continue it will be found out then it will be too late to lament.

"W. tells me A. bought a spring coat for one hundred. I would much rather have pocketed seventy-five of it. She is certainly very extravagant. But you must remember you have spoiled her there is a vast difference between the two of us (26) —So long as you were obliged to face all the storms and blizzards I would never think of getting spring coat for that money. Perhaps I might want a seal some day. But I doubt if I could have had much more wearing apparel had I been so inclined—

Not that I am close or mean, I think it is useless to buy such high priced garments so long as fashion changes so often. A. should remember that one gets old and will not be able to always face the weather and soon you will have very little left of what was accumulated then she must live accordingly in the end. (That's enough of this kind. I will get on some other subject) You will not press me to write so often if I write in this style. I still feel the electrification (is that right) do you feel me yet (**26½**)?"

"*So you sleep in separate beds, Aug. and I might occupy single beds as each lays on the very edge for the last three weeks* (**27**). The outlook is not very agreeable and may last for some time. I am perfectly satisfied in that respect. If he only would not harass me by repeating things which I never done. I hope you will believe and trust in me always.

"Yours only,"

Date of this letter cannot be proved beyond dispute, but it is dated "21st," and was doubtless written March 21, 1894, being after the "fright" or ticket affair of February 19, 1894, and three weeks after the parties began sleeping on the edges of the bed.

(**26**) A comparison of the relative economy of the wife and herself.

(**26½**) Is this the language of purity or modesty?

(**27**) The probable object of this disquisition upon the reciprocal sleeping apart from their spouses is to indicate that her favors were not shared, but its indecency is all that concerns the case.

EXHIBIT "E."

"I don't know what to write first.

"The insults from W. has been heaped upon me without measure. Two weeks ago I never expected to hear anything more of *you* through her—then when you sent the message through the only channel and it got into wrong hands I pleaded with her to see you once more and end it—(**28**) and remarked if I only had money—but there I am obliged to let everyone trample on me.

"What I have gone through can never be told—

"(Sat 12.30).

"Aug has gone to town and I am watching for you to pass. Perhaps you have already gone by—When you write and say I want to give you the shake—it sounds so lightly—I will sacrifice my life if necessary. I am wild to see you—It is like craving for something good to eat. I wish I could be with you and

talk to you for at least three hours I could feel better satisfied
—It is a little satisfaction to meet for such a short time ; hardly
are we together before the time expires to separate, but I am
not able to see you 15 minutes, much less 3 hours.

"I am constantly planning for a meeting. So often when the
time comes to arrange the signal I get so nervous and have no
power and control over myself—In the last four months I am
often like one paralized.

"You have me crazy; this is the second time you drove by
this afternoon—Perhaps next Sat or Sun, I will meet you at
Haas' about 3 P. P. **(29)** If possible drive past the house at
one P. M. or 1.30 because Aug. never tells me $\left(\genfrac{}{}{0pt}{}{\text{erased}}{\text{until}}\right)$ when he
is going out until the last min— **(30)** This life is dreadful it
is like pining away with some disease.   Next month I will have
five hundred.   Many thanks.   I feel lonesome and everything
else.   Don't depend upon seeing me as something might happen
in the meantime—Believe me to be true and faithful.   If I could
only fly and shake everything else but you."

Date of this letter cannot be exactly fixed, but it was subsequent to February 19, 1894, when libellant ceased to tell his wife when he intended going out.

**(28)** The respondent admits she used a Mrs. Wilsonhome as a messenger to try to avert the impending explosion, but changes the circumstances in her testimony as compared with this letter by simply making it appear she was sent to the co-respondent's wife, not to himself.

**(29)** Haas's hotel is at Fifteenth and Filbert streets.

**(30)** After the ticket affair of February 19, 1894, libellant never told respondent when he intended going out.

### EXHIBIT "D."

"I had fully intended not to write for the next three or four
months but after receiving the little message in the gloves,
thanks, and seeing you at the mansion this morning my heart
commenced to beat wildly and could not resist sending you a
few lines to tell you I have not forsaken you—will be true to
the end.   I am so afraid A. will find a letter when you least
think of it, at night perhaps you think she is asleep will come
down quietly and slyly snatch a letter of mine or yours.   Then
I am lost.   **(32)**

"A told me she watched you and saw you crying when you
knew nothing of it.   She is positive you are worrying.   (If I

were only not the cause) and if I let you alone you will soon be the same devoted husband. (**33**) Altogether she was very cautious in what she said (**34**) I told her if she talked to me as a lady I will listen (She said I must listen) otherwise I would leave the room and she would walk out the door she came in. I really think they know nothing; only they · are convinced about the tickets—(**35**)  Aug. said he would see A.  I told him if he did I would see you—(Then I might go and stay with you.  (**36**) *If things don't change here I will be tempted to leave again ; then if there is no proof against me I can stand firm.* Therefore if you do not hear from me I remain Thine only.

"Many thanks for the last."

The exact date of this letter cannot be shown, but it was subsequent to the ticket affair of February 19, 1894, and subsequent to the interview between respondent and co-respondent's wife, which was in the following winter.

(**32**) The precise prediction is here made of what actually happened, **viz:** Exposure of the intrigue by means of these letters.

(**33**) The use of the word "husband" shows, what has been evident all through from the context, that "A" is the wife of the co-respondent.

(**34**) Respondent told libellant, so as to forestall his hearing it from others, that co-respondent's wife had various interviews with her to try and stop scandal.

(**35**) This refers to the tickets to Chicago, the two Pullmans and all the circumstances of February 19, 1894, which rekindled libellant's dead suspicions.

(**36**) Libellant told respondent he would go to see co-respondent's wife, whereupon respondent said she would go to see co-respondent.

Milton C. Work testifies that he was professionally employed in 1895, declining, for proper reasons, to name the person who employed him, but in consequence of said employment, he wrote letters to the respondent and co-respondent to visit him at his office.  The respondent, in answer to said letter, came to the office accompanied by a lady, who she named then as Smith, but who is afterwards identified in this case as Eliza Webb Clothier, otherwise as Eliza Lukens, and with whom the respondent now resides; and she was then and there told by Mr. Work that he could prove that an improper intimacy existed between herself and the co-respondent, and that he desired such intimacy should cease.  She asked him how he could prove it, and he answered, in a number of ways and by certain letters in his possession.  He went to the safe and brought out said letters,

which are the same letters produced before the master and here-tofore spoken of.   She glanced at them merely, not examining them critically and said, "How can you prove that they are in my handwriting?"   To which he made answer to the effect that he would have no difficulty in doing so when she said, "But the letters are not signed or dated."   Said letters were also exhibited to the co-respondent and his counsel when they called, when he said they were old and of no consequence, and his counsel remarked that they were " merely platonic."   This answer was made when exhibit " F " was produced.

Mr. DeHaven testifies of the visit of the respondent to his office ; that he told her if she ceased to have anything to do with the co-respondent the matter would end there, "but if the matter which we understand exists between you now is kept up, we (meaning the attorneys) will invoke the law, even to the extent of arresting the parties concerned."   She answered that it was not her fault, and that she would not see or hear from the doctor, and further, she said that if her husband knew of it there would be a great deal of trouble, and that he would probably kill her, or words to that effect.   Subsequently Dr. Boyer and his wife called at the office of the said attorneys and a fee of $25.00 was paid, and that ended their participation in the matter.

Subsequently, however, on December 17, 1896, upon a rule granted by the court, the said letters in the hands of the said attorneys were impounded and marked and exhibited as part of this case.

Anticipating at this point evidence which appears later, we find a lady by the name of Mrs. Bihm, who is called by the respondent, and who testifies that, about this time in 1895, when this affair was going on in the office of the attorneys, Work and DeHaven, the wife of the co-respondent requested her to accompany her to see the libellant virtually to get his assistance to break up this connection between the respondent and the co-respondent; because, in answer to a question by the master as to the reason of Mrs. Boyer making this visit, she said, " The whole thing is that Dr. Boyer is keeping Mr. Gruninger's wife."

Undoubted inferences can be drawn from facts.   Adultery is very seldon proved by eye-witnesses, and many other crimes are proved only by circumstantial evidence.   It would be the merest folly for the master, or anyone else in reading this testimony,

to pretend that he could be so far blind and ignorant as not to see, without being directly told in so many words by Work and DeHaven, that their client was Mrs. Dr. Boyer, and the master so finds ; which goes very largely to fix the undoubted fact that the letters referred to were found by the co-respondent's wife and conveyed by her to her attorneys. This fact, taken into consideration with one of the paragraphs in one of the letters, which says that she is sly (meaning the co-respondent's wife), and would probably capture one of these letters, and also that one of the incidents is absolutely corroborated by the evidence of Mrs. Bihm, who states that she heard Mrs. Boyer tell Mr. Gruninger that she had found or seen the tickets in the doctor's pocket. Also it is to be noticed, that at the end of the letter marked exhibit " A " are the words, " Dr. Please destroy all letters." But the value of the letters as admissions of the relations between herself and the co-respondent is in no way affected by the manner in which they were obtained by Work and De-Haven.

Having thus identified beyond doubt the connection of the respondent and co-respondent with these letters, there can be no possible doubt in the mind of the master that had a proceeding been commenced at this period, and these letters had been known to the libellant, in connection with the previous affair of 1883, a decree of divorce as prayed for in the libellant's present bill would have been sustained. However, as previously stated, he was ignorant of these facts, and, taking the precautions heretofore mentioned, he continued to live with the respondent as heretofore until the event of September 25, 1895, occurred.

As related by the libellant, on September 25, 1895, he found his wife crying and in great distress, and that, as the result of her agony of mind, she then and there made a confession, the only part of which that is at all pertinent to this issue, being that she had committed adultery with the co-respondent on five occasions in the city of Frankford, and that she was annoyed at the presence of detectives, who had prevented her almost from touching the knob of her door for four months. (Detectives were shadowing Dr. Boyer and herself, employed by Work and DeHaven.) The libellant further testifies that previous to this confession he had been acting under the advice of counsel, and that a very short time after he again consulted counsel, and that, as

a matter of course, guided his future actions by his advice.　It is very evident that this voluntary confession of hers would not, of itself, be sufficient evidence of the crime charged by him.

We have now following this, a confession made to Mrs. Balz, her sister-in-law, with whom she had been intimate and on affectionate terms up to this period.　Mrs. Balz testifies that the respondent was in the vestibule of her husband's house just across the street.　" I went over, she embraced me and cried and went on terrible, and asked me wouldn't I plead with my brother for her; that she had wronged John so long that she was afraid he would not forgive her again; that she had wronged him for years; that she was guilty of all this trouble; ' John was too good to me.'　In the evening, at the front door in the vestibule, she said to me, ' I have told John everything; I have confessed all I have done.' "　Louis Gruninger testifies that about three weeks before the respondent left home she called upon him, and, in answer to his question, " What is it you want," she said, " I would like you to speak to John for me, and ask him to forgive me."　She stated that she had confessed to John that she was guilty of what she was accused of.　She said, " I have wronged John for years, and I will do better than I ever did if he will give me another chance."　E. W. Shuttleworth, a friend of both parties, and undoubtedly a disinterested witness, testified that in the forepart of December, 1895, which must have been prior to the issuing of this writ of subpœna in divorce, the respondent came to his house; " She was crying, and told me that Mr. Gruninger and her had had words, and asked me would I see Mr. Gruninger and try and beg him to forgive her once more, and if he did not she would go crazy; that she had done wrong for several years, and would I see him and beseech him to forgive her.　I asked her in what way she had wronged Mr. Gruninger; she told me through being too intimate with Dr. Boyer.　She also told me that he was a good husband and had been a good father all his life, and that he was too good for her."

These confessions must now be taken into consideration with all the facts in this case that had previously occurred.　Her own confession was so convincing to the mind of the libellant, that he took what he considered at that time the only proper course to pursue, and that was to direct the respondent to take another

bed, and so far as he could at that time separate himself from her and dissolve marital relations. This condition of affairs existed until December 14, 1895, when the subpœna in divorce was served, and, as stated by her in her answer, she left the house of the libellant. The respondent, it is needless to say, denies these confessions, and absolutely and unequivocally denies the charge of adultery; the co-respondent also does the same.

In the charge which the libellant makes, he admits that the time and place of the adultery is unknown except as to the confessions; and if the libellant is to be believed, and the master sees no reason why he should not be believed, the place has been fixed in Frankford, and the time still remains indefinite. In determining this case, the rule by which the master has been governed, is not that the evidence must produce absolute certainty, nor that the evidence must be sufficient to convict the co-respondent of adultery, but whether, under all the circumstances of the case, he is convinced beyond a reasonable doubt, and this conviction must be absolutely inconsistent with the innocence of the respondent. This is the law as laid down in Allen v. Allen, 101 N. Y. 658; Caton v. Caton, 13 Jur. 431, 432; 5 Am. & Eng. Ency. of Law, p. 828. In the latter case the court said, "It is not sufficient that the court should be morally convinced of the guilt of the defendant; it must be satisfied that such conviction is founded on legal evidence applicable to legal charges."

A suit in divorce in its nature is partly civil, partly equitable, and partly criminal. The proof should sustain the allegation. The allegation in this case, is that adultery was committed with one A. H. Boyer, and the proof must sustain that allegation beyond a reasonable doubt. Accepting this rule and applying it to this case, the master finds that the respondent did commit adultery with the co-respondent. This fact having been ascertained, we are now met with the plea of condonation which virtually says, you cannot divorce me because the libellant has condoned the offense. No true, innocent woman, strong in her virtue, strong in the love and affection of her two sons who are not with her in this case, would stand upon condonation when she could crush the destroyer of her honor and her home, by proving that she was absolutely innocent. The master's finding is, however, in no way influenced by this plea.

How was this offense condoned? We will not speak of the letters of 1883, nor the confession of 1894, but how were the confessions of 1895, condoned? Here is an unsophisticated plain man, wronged, worried, and not knowing what to do, who thinks it sufficient to tell his wife to keep her own room and he will keep his; and still hesitates in the kindness of his heart to turn her out of doors until he is more fully satisfied even of the confessions, which were at that time uncorroborated by the three witnesses produced before the master, nor in any way made certain by the contents of those incriminating letters impounded December 17, 1895.

Condonation, to be complete, must not only be forgiveness and the restoration to full marital rights, but must be made with full knowledge of all the facts of the case, which was not the case here; because the libellant positively states that there was no restoration of marital relations, and it was absolutely certain that he knew nothing of the correspondence as exhibited heretofore. The respondent, in answer to a leading question says, that cohabitation took place between them within a day or two of the issuing of this writ, which the libellant denies, and which denial is partly corroborated by one of the sons, who states that so far as his knowledge went, they occupied separate rooms and separate beds.

It is more consistent with the facts of this case, that the master should in this matter of cohabitation believe the libellant, then acting under advice of counsel, than that he should believe the respondent. It is further suggested by the master that it is utterly beyond the pale of reason or a proper judgment of facts that the libellant, after this confession of 1895, and whilst in the preparation of a divorce suit, should have condoned the offense and thus have rendered all his efforts to right his honor and to protect his name useless. The master finds, as a fact, there was no condonation.

Some stress was laid by the respondent's counsel upon the remark made to Mr. Luken: "Dr. Boyer's keeping my wife, and I am glad of it," and of Mrs. Bihm: "He did not care whether Dr. Boyer kept his wife or not," but your master cannot find that these remarks weaken the case of the libellant. To Mr. Lukens they were made while seeking evidence of his wife's infidelity, and to Mrs. Bihm, as explained, he meant that

"give them rope enough and they would be caught." They were petulant, but in no sense can they be construed to amount to the importance of connivance which, however, is not claimed as a defense by the respondent.

The master, therefore, after carefully considering the whole of this evidence, and examining it with the utmost kindness and fidelity to the respondent, can arrive at but one conclusion, and that is, that the libellant has proved his case beyond doubt, and the master can arrive at no other conclusion than that the libellant has sustained by proof the allegation of his libel, and that he is entitled to receive from your honorable court a decree as prayed for, divorcing him, the said libellant, from the bonds of matrimony with the said respondent.

*Errors assigned* were in dismissing exceptions to the master's report.

*Lincoln J. Eyre* and *Samuel Gustine Thompson*, with them *Bassler Boyer*, for appellant.—The evidence was insufficient to sustain the charge of adultery : Hamerton v. Hamerton, 2 Hagg. Eccl. Rep. 8 ; Browne on Divorce, p. 47 ; 2 Bishop on Marriage, Divorce and Separation, sec. 1360 ; Westmeath v. Westmeath, 4 Eng. Eccl. 238 ; Thayer v. Thayer, 101 Mass. 111 ; Caton v. Caton, 13 Jurist, 431 ; Ferguson v. Ferguson, 3 Sandf. 307.

The charge of adultery must be shown by proof of acts and circumstances that convinces the mind by a preponderance of their weight, and not be mere suspicion or conjecture from vague circumstances, pointing to no specific time, place or act : Carter v. Carter, 62 Ill. 439 ; Allen v. Allen, 101 N. Y. 658 ; Pollock v. Pollock, 71 N. Y. 137.

An intercepted letter from the alleged paramour to the defendant is not admissible in evidence, unless it come to the knowledge or possession of the latter : Hobby v. Hobby, 64 Barbour (N. Y.), 277.

If the letters are to be treated as confessions, they are not admissible, because confessions must be clear, distinct, and unequivocal admissions of adultery : Edwards v. Edwards, 9 Phila. 617 ; United States v. Ross, 92 U. S. 281 ; Douglass v. Mitchell, 35 Pa. 440 ; Grant v. Grant, 2 Curteis, 57.

It is the settled practice in most states not to grant divorce upon the alleged confession of respondent, without other and

corroborative proof.    Courts look with suspicion on proof that may be easily manufactured : Betts v. Betts, 1 Johns. Ch. (N. Y.) 197 ; Sommerbell v. Sommerbell, 10 Stewart (N. J.), 603 ; White v. White, 45 N. H. 121; Holland v. Holland, 2 Mass. 154; Burgess v. Burgess, 47 N. H. 395; Clutch v. Clutch, Saxon (N. J.), 474; Edwards v. Edwards, 3 Pittsburg, 333; Stewart on Marriage and Divorce, par. 346; Black v. Black, 5 York, 67 ; Matchin v. Matchin, 6 Pa. 332; Realf v. Realf, 77 Pa. 31 ; Quick v. Quick, 6 Kulp, 137 ; Pollock v. Pollock, 71 N. Y. 151 ; Crawford v. Crawford, L. R. 11 Prob. Div. 150.

*Thomas Leaming*, for appellee.—There being no questions of law in the case, it may be that the court will say, as heretofore, that the conclusions of fact of the lower court should be accepted unless manifest error was clearly shown : McMillin v. McMillin, 183 Pa. 91.

The letters between the respondent and the co-respondent were properly admissible: Loveden v. Loveden, 2 Haggard's Rep. 1 ; Grant v. Grant, 2 Curteis, 16.

The testimony was sufficient to sustain the charge of adultery : Matchin v. Matchin, 6 Pa. 332; Allen v. Allen, 101 N. Y. 568; 2 Greenleaf on Evidence, sec. 40 ; Stickle v. Stickle, 48 N. J. Eq. 336.

There could have been no condonation prior to the confession of September 25, 1895, because up to that time the husband was merely suspicious and had no facts to go upon : Gosser v. Gosser, 183 Pa. 499.

OPINION BY MR. JUSTICE McCOLLUM, April 24, 1899:

The parties to this litigation are husband and wife.    The former seeks to obtain a divorce from the latter on the ground of her alleged adulterous intercourse with a married man who, for the sake of convenience, may be designated herein as the co-respondent.    The libellant and respondent were married on December 30, 1875, and lived together peacefully until 1882 or 1883, when the intimacy existing between the libellant's wife and the co-respondent raised a suspicion of improper intercourse and led to a quarrel between the husband and wife which resulted in her temporary absence from their home.    On her return to the home there was some bickering, for awhile, between the husband and wife as a consequence of the inti-

macy referred to, but it eventually terminated in a mutual understanding that there should be a discontinuance of the obnoxious intimacy and a renewal and proper observance of the marital relation. At that time they had two children of tender age who were entitled to the affection and care of the parents, and this circumstance may have been, and probably was, an important factor in the restoration of peace and the promotion of mutual forbearance. After this reconciliation there was a period of about ten years in which there was no serious altercation between the libellant and the respondent, although subsequent developments tended to show that, while there may have been an interruption of the former intimacy between the latter and the co-respondent, there was not an absolute discontinuance or abandonment of it. Meanwhile the libellant appears to have relied on the pacification of 1883, and to have been unconscious of any violation of the mutual understanding which was the basis of it. It was not until February, 1894, that his suspicion of his wife's infidelity was revived. The immediate cause of its revival was an occurrence, the true nature of which, according to the testimony of the libellant, the respondent endeavored but failed to conceal from him, and which, on her discovery of his knowledge respecting it, she implored him to refrain from giving publicity to. After the occurrence referred to, circumstances previously unknown to the libellant and corroborative of his suspicion of improper intercourse between his wife and the co-respondent appeared, together with subsequent circumstances of a like nature. According to the testimony of the libellant the respondent, on September 25, 1894, voluntarily confessed to him her guilt. The confession may have been prompted by well-known circumstances or occurrences inconsistent with her innocence, or by an ebullition of penitence. It resulted, however, in the occupancy by the parties of their respective rooms thereafter, in the institution of this suit on December 12, 1895, and in her retirement from his home the next day.

We have not yet referred to the correspondence between the accused parties. None of the letters bear the signature of its author. One of them bears date July 30, 1883, and the rest are practically without date. The co-respondent did not deny that he wrote the letter of July 30, 1883, but said he had no recollection of writing it, and that he never sent it to the respondent.

The letters marked exhibits A, B, C, D and E were shown to the respondent on the trial, and when she was asked if she wrote them her reply was "I don't know" or "I can't say." The testimony of reputable and disinterested members of the bar charged with the custody of the letters pending the proceedings for a divorce tended to show that she recognized them as her work, and that she believed the omission of date and signature was sufficient to prevent the identification of them. The libellant, his two sons, and his sister, Mrs. Balz, were familiar with the handwriting of the respondent, and they testified positively and distinctly that the letters were written by her. Aside from the oral testimony relating to the source and authenticity of the letters there is quite enough on the face of them to establish an unlawful intimacy, and when it is considered in connection with the oral testimony the conclusion that the respondent and co-respondent were parties to it is irresistible.

In the testimony of Lewis Gruninger, Wilhelmina Balz and E. W. Shuttelworth, there is abundant corroboration of the. testimony of the libellant in regard to the respondent's confession to him on September 25, 1895. It plainly appears from their testimony that the respondent admitted the intimacy charged in the libel and appealed to them to persuade the libellant to condone it. A mere denial by the respondent that the confession was made as claimed is not a satisfactory answer to the testimony of the libellant corroborated by the testimony of the witnesses above named.

We have not specified herein all the circumstances and occurrences pertaining to the intimacy existing between the accused parties, but we have carefully examined and considered all the evidence in the case, and our conclusion from it is that it fully sustains the averment in the third paragraph of the libel and the first averment in the bill of particulars, and that it does not sustain the averment in the respondent's supplemental answer. It is presumed that the duty which rests upon the courts in divorce cases was faithfully and fairly discharged in the case before us and, as there is no pretense or color of claim that it was not argued and decided on the evidence in it, we see no sufficient cause for setting aside the decree entered by the learned court below. We therefore dismiss all of the assignments.

Decree affirmed and appeal dismissed at the cost of the appellant.