## Cook v. Cook.

*Divorce—Adultery—Evidence—Sufficiency.*

1. In a libel for divorce, direct proof of carnal intercourse between the respondent and the co-respondent is not necessary to establish adultery. It may be established by circumstantial evidence; for, being committed in secret, it is seldom susceptible of proof, except by circumstances, which, however, are sufficient when they would lead the guarded discretion of a reasonable and just man to a conclusion of guilt.

2. The proof of adultery is the same in civil and criminal cases, the only difference being in the quantity. In the former, the offence is proved by the preponderance of the evidence; while in the latter, it must be shown beyond reasonable doubt.

3. The proof, whether direct or circumstantial, must show three things to establish the commission of the offence; the opportunity, the adulterous disposition in the mind of the party charged with the offence, and the adulterous disposition in the mind of the *particeps criminis;* whenever these things concur, the offence is presumed to have been committed.

4. If a criminal love or desire is shown to have existed between the respondent and the co-respondent, proof which would otherwise be scarely sufficient to raise a passing cloud of suspicion will possess a most convincing force.

5. On the hearing of a libel in divorce for adultery, twelve of the respondent's letters to the co-respondent, which were in evidence, showed that for eight months, from September, 1916, to May, 1917, she had conducted a clandestine correspondence with him; many of them contained indelicate allusions entirely inconsistent with platonic relations; others indicated her dominating passionate desire for intimate physical contact with him, and that she had had many stolen interviews with him. She had destroyed all letters received from him by her. The testimony also showed that she frequently arranged and held clandestine meetings with him in her own home and in the private apartments of a friend, took long walks with him, visited alone with him various public restaurants, hotels, moving-picture theatres and other places of entertainment; likewise, by prearrangement with him, she met, and was entertained by, him in New York and Atlantic City. In New York she stayed with friends for a few days and saw the co-respondent on three separate occasions during two days, and went to several hotels with him. The purpose of these visits was not explained, and, under the testimony, the conclusion that she spent considerable time, probably hours, alone with him on these visits would not be unwarranted. At Atlantic City, she stayed with her mother at the S. Hotel, occupying separate rooms, not connecting with one another, on the third floor. On her invitation, the co-respondent joined them. He registered at the same hotel and was assigned a room on the fourth floor. The next day he left. Libellant did not know of co-respondent's visits to respondent: *Held,* that both respondent and co-respondent were dominated by adulterous desire during the eight months of their illicit love affair, that mere opportunity with comparatively slight circumstances showing guilt would be sufficient to justify the inference that carnal intercourse had taken place, that general opportunity was at hand on numerous occasions during their association, that adultery had been committed, and the libellant was entitled to a divorce *a. v. m.*

Husband's exceptions to master's report. C. P. No. 5, Phila. Co., Sept. T., 1917, No. 68, in Divorce.

*W. W. Smithers,* for libellant; *W. H. Hepburn,* for respondent.

MONAGHAN, J., Sept. 29, 1924.—The parties were married on Sept. 30, 1915. Thereafter they lived together as man and wife, without apparent discord, in an apartment of Hamilton Court, until May 30, 1917. On that day the husband withdrew'from the common habitation, and they have never since resumed marital relations.

It appears that on the day preceding the final separation the husband received by special delivery or registered mail, at his place of business on Broad Street, a parcel containing a batch of twelve letters, one telegram and several picture cards. He does not know, and the evidence fails to disclose,

Cook v. Cook.

the identity of the person who mailed the package; but the obvious purpose of the sender, whoever he or she may have been, was to apprise R. Weary Cook, the husband, of an undue intimacy existing between H. Amanda Cook, his wife, and J. Harry Sommers; for the letters, all in the handwriting of the wife, were replete with the most fervid expressions of her love for Sommers, to whom they were addressed, and plainly showed to the husband that during the period extending from September, 1916, to May 1917, she had not only carried on a continuous clandestine correspondence with Sommers, but had also met him in secret.

Until he had read the letters so delivered to him, Cook had no knowledge, and was apparently without suspicion, of any undue intimacy between his wife and Sommers. After receiving the parcel of correspondence, the husband returned to his home the same evening and spent the night with his wife, but did not mention to her anything concerning the letters or their import. Immediately upon arising, at about eight o'clock of the morning of the next day, May 30th, he charged his wife with having written letters to Sommers. This, at first, she denied, but finally admitted that she did write to him, but only "as a sister would write to a brother." In the course of the discussion, Cook intimated that she had improper relations with Sommers. Although she positively denied any wrongdoing, she, nevertheless, acknowledged to her husband that she had "indulged in the foolish pastime of seeing" Sommers, and offered to call him on the telephone to let him know that she "was through with him and would not have anything more to do with him." Cook produced the letters, and was reading one of them to his wife, when she said, "that's enough." He read no more, but said that he would leave her. She pleaded with him to remain. Notwithstanding her importunities and protests, Cook then left the home. Before leaving, he told his wife that she might continue to live in the apartment until the expiration of the lease on Oct. 1, 1917, and he would pay the rent therefor and contribute, in addition, $185 a month for her support. Four or five days after the separation, the husband returned to the apartment for some of his clothing which he had left there. The wife then urged him to remain with her. Regardless of her entreaties, he refused to do so, and, having obtained his clothing, left the home. The wife continued her residence in the apartment of Hamilton Court until about Oct. 1, 1917, when she surrendered the same, and then went to live at Atlantic City, New Jersey, where she has ever since dwelt at various addresses with her mother, without, however, establishing a permanent residence there. From the time the husband left his wife, he has continued to maintain his permanent residence in this city, actually living here, excepting for a period when he was engaged as captain in the military service of the United States, and for a short time in Baltimore.

On Aug. 16, 1917, the husband filed his libel, in which he charged that his wife, at various times between August, 1916, and May, 1917, committed adultery with one "Harry" in the Hamilton Court apartment-house, and in other places in Philadelphia and in the City of New York and Atlantic City. A bill of particulars was filed, and in due course the respondent made answer, denying specifically each accusation. The cause was assigned to William F. Rorke, Esq., as master. Before the taking of testimony had been completed, Mr. Rorke died, and John M. Scott, Esq., was appointed in his place.

On Feb. 16, 1920, Mrs. Cook filed a cross-libel, asking for a decree of divorce a mensa et thoro on the ground of wilful and malicious desertion by her husband on May 30, 1917. In this libel Mrs. Cook alleged that her residence was then temporarily at the Hotel Dennis, Atlantic City, New Jersey, that she

had been a resident of the State of Pennsylvania for forty years previous to the filing of the libel, and that the present residence of her husband was No. 1904 Spruce Street. The court, upon petition duly presented, allowed the allegation of residence to be amended as follows: "That the present residence of the libellant is with the respondent at No. 1904 Spruce Street, in the City of Philadelphia, in the State of Pennsylvania, and she has been a resident of the State of Pennsylvania for the past forty years previous to the filing of this libel. That she has no other residence in any other state other than above set forth." The husband filed an answer, in which he asserted that the allegation of residence, as set forth in the libel and its amendment, was untrue, and averred that Mrs. Cook had been a permanent resident of Atlantic City, New Jersey, continuously since the year 1917, and still resided there; and he further averred that he had given up residence in the City of Philadelphia in May, 1919, and lived continually in Baltimore until the latter part of July, 1919, when he returned to Philadelphia and resided at No. 1904 Spruce Street, and had lived there but seven months when the cross-libel was filed; wherefore, he said, this court was without jurisdiction in the matter of the cross-libel. The husband, in his answer, also denied that he wilfully and maliciously deserted his wife, and averred that, in consequence of the wife's letters to J. Harry Sommers, she had acquiesced and consented in his separation from her since May 30, 1917. The wife's cause on the cross-libel was also assigned to John M. Scott, Esq., as master, who, after the completion of the hearings on libel and cross-libel, filed his report, in which he recommended the dismissal of the husband's libel because he deemed the evidence insufficient to establish adultery. He also recommended that a decree of divorce *a mensa et thoro*, including an order for alimony at the rate of $300 per month, be entered in favor of the wife. To this report the husband filed exceptions now before us for consideration.

The husband, R. Weary Cook, or, as he is sometimes called in these proceedings, Ralph W. Cook, was, during the period of cohabitation with his wife, employed as a manager of an automobile concern at a very substantial salary. He was a busy man; nevertheless, he spent the evenings, Saturday afternoons and Sundays with his wife, except when he was absent on about six business trips, of two or three days' duration each, in Cleveland or Canton, Ohio, or in the City of New York. He made proper provision for the maintenance of the wife and home, and frequently accompanied her to dining parties, to the theatre, the opera and to other places for their social diversion. He was in every way a dutiful husband. To him, she seemed the dutiful wife, for there was nothing in his personal knowledge or observation of her conduct that could lead to a suspicion of any infidelity on her part, until he received the parcel of letters which caused him to leave her. In the first year of their married life the wife was in fact true to her husband. During the last eight months in which they lived together she completely deceived him, for, while she was almost invariably at home when he appeared, and then acted as a dutiful wife, she, notwithstanding, took advantage of his absence when he was at his daily work, and on his occasional trips out of the city, to carry on a secret love affair with another man. The testimony shows that in September, 1916, just about a year after the marriage, the wife attended a matinee in a local theatre. As she was leaving, she met J. Henry Sommers, who had been present at the same performance. Mrs. Cook had been a widow for eight years preceding her present marriage, and during that period she had been well acquainted with Sommers, and apparently had been, to some extent, the object of his attentions. He was ten years her junior, and from his

Cook *v.* Cook.

photograph he appears to be a man physically well built and of handsome appearance. Mrs. Cook was, in 1916, about thirty-seven years of age and of attractive personality. When they met at the theatre, Mrs. Cook said, she renewed her friendship with Sommers. Under the circumstances, it is not strange that the casual meeting between the prepossessing married woman and the handsome young man would lead her to disregard the proprieties of married life; and the course of events proved that the chance meeting marked the departure of Mrs. Cook from the path of rectitude and the commencement of the intimacy between her and Sommers which has resulted in the wreck of her home and her presence as a party in this unpleasant, if not noisome, litigation.

At the hearings before the master, Mrs. Cook testified that, after the renewal of the friendship and until May, 1917, she met Sommers in Philadelphia on numerous occasions in the afternoon, when she dined with him in tea-rooms, restaurants and hotels, attended the moving-picture shows, took long walks with him from the central portion of the city to West Philadelphia, and, on two afternoons and once in the evening, visited with him the private apartment of a Mrs. Paxson, who, it is claimed, was present each time, except for "minutes." Mrs. Cook also testified that, in accordance with a mutual arrangement she had made with him, Sommers visited her apartment in the Hamilton Court, in the absence of the husband, for as long as an hour at a time, on at least six different occasions, the colored maid then being present somewhere in the suite of rooms, performing her usual household duties. From the testimony of Mrs. Cook, it further appears that she met the co-respondent in New York in January of 1917, and there accompanied him on two days to four places of entertainment; and that in March of 1917, at her invitation, he visited her in Atlantic City, where he spent a considerable portion of a day with her, her mother or some friends always being present. Mrs. Cook, when before the master, admitted writing with her own hand the twelve letters theretofore anonymously delivered to her husband, and that these missives comprised part of a correspondence which she had carried on with Sommers from September, 1916, to May, 1917. She destroyed all letters received by her from the co-respondent immediately after she had read them.

Mrs. Cook's testimony shows beyond doubt that all her meetings, associations and correspondence with Sommers were without the knowledge or consent of her husband.

The series of facts just related are but a resumé of the nature and character of the relations which existed between Mrs. Cook and Sommers. We will hereafter discuss in detail the evidence bearing on the important phases of the case.

An examination of the entire record discloses that there is no direct proof of carnal intercourse between Mrs. Cook and the co-respondent. Adultery, however, need not be established by direct proof; it may be established by circumstantial evidence; for, being committed in secret, it is seldom susceptible of proof except by circumstances, which, however, are sufficient when they would lead the guarded discretion of a reasonable and just man to a conclusion of guilt. On this principle, a wife's visit with a man to a brothel, or to a man at his lodgings, has been held sufficient proof of it, because it is impossible to assign an innocent motive for such a meeting: Matchin *v.* Matchin, 6 Pa. 332; Gruninger *v.* Gruninger, 190 Pa. 633; McCune *v.* McCune, 31 Pa. Superior Ct. 248; Reighter *v.* Reighter, 58 Pa. Superior Ct. 636; Hilton *v.* Hilton, 66 Pa. Superior Ct. 378.

The proof of adultery is the same in civil and criminal cases, the only differ-

ence being in the quantity. In the former, the offence is proved by the preponderance of the evidence; while in the latter, it must be shown beyond reasonable doubt. Nor does the law require that the parties should be surprised in the direct act of adultery, but the offence may be inferred from some circumstances, or a number of circumstances, justifying the conclusion of guilt. Facts showing lack of discretion, or justifying a strong suspicion of guilt, will not alone be sufficient; but where the evidence shows a state of conduct between a married woman and a man not her husband, which has continued secretly over a long period of time, and showing a total lack of the proprieties of married life, with ample opportunity for the commission of the offence, they should not be heard to complain that those sitting in judgment are unable to reconcile their actions and conduct on any theory other than that of guilt: Darragh v. Darragh, 47 Pa. C. C. Reps. 155. The offence is established by showing circumstances which lead fairly and necessarily to the conclusion of adulterous practices as alleged in the libel: Garr v. Garr, 19 Pa. C. C. Reps. 502; McCune v. McCune, 31 Pa. Superior Ct. 248; Gruninger v. Gruninger, 190 Pa. 633; Reighter v. Reighter, 58 Pa. Superior Ct. 636.

The proof, whether direct or circumstantial, must show three things in order to establish the commission of the offence: the opportunity, the disposition in the mind of the party charged with the offence, and the disposition in the mind of the particeps criminis. Whenever these things occur, the offence is presumed to have been committed. To prove the three things is to prove the act itself; the opportunity and the will must concur, or guilt will not be inferred. The adulterous disposition must be manifest, and it may be implied where the parties were together with ready facility of access, which cannot be easily accounted for unless they have that design, or which could not be well explained without it: Bishop on Marriage, Divorce and Separation, 42. Proof of opportunity without adulterous disposition, or of adulterous disposition without opportunity, is not sufficient to establish the offence.

Mrs. Cook, while admitting that she had on numerous occasions, extending over a period of eight months, met and associated with Sommers in public places in this and other cities, in private apartments of another person and in her own home, and had carried on a correspondence with him during the same period, all of which was without the knowledge or consent of her husband, nevertheless denies that she ever committed adultery with him, or that she had the disposition or opportunity to do so.

Guilty love generally precedes adultery. A wife never commits it until after she is depraved in mind and heart. Her mind must be debauched before she will allow her person to be. In cases of this class, where infidelity is charged against a wife, it is always important to inquire whether the evidence shows she has so far suffered herself to be alienated from her husband as to allow criminal love or desire for another man to enter her heart. If such a passion is found dwelling there, proof which would otherwise be scarcely sufficient to raise a passing cloud of suspicion will possess a most convincing force: Black v. Black, 30 N. J. Eq. 228.

Guilty attachment is shown conclusively in this case. Twelve of the wife's letters, one telegram and several picture cards, sent by her to Sommers, are in evidence. Their authenticity is undisputed. Other letters than those before us were sent by Mrs. Cook to Sommers. Four of these were still in the possession of the co-respondent after the final separation of the parties. Bruce Kirkpatrick, a brother of Mrs. Cook, hearing of the difficulty between his sister and her husband, then called upon Sommers, procured the letters and destroyed them. Mrs. Cook destroyed all letters received by her from Som-

Cook *v.* Cook.

mers. If innocent, why the deliberate destruction of the letters? However, those before us present a sad picture of moral degradation, of lascivious love, of stolen interviews and a continuous clandestine correspondence during the period of eight months between September, 1916, and May, 1917. An examination of all the evidence, including the letters, does not disclose any interest in common between Mrs. Cook and Sommers other than illicit love.

We deem it unnecessary to quote the many terms of endearment and expressions of love contained in the letters. The following passages, however, plainly show the wife's slurring references to her husband; her craving for the co-respondent, even during his absence for short periods; her extreme jealousy of him; indelicate allusions entirely inconsistent with platonic relations; her dominating passionate desire for intimate physical contact with and embrace of Sommers; and are not without strong suggestion that sexual intercourse occurred:

"My darling Boy: You are the sweetest thing and I am getting perfectly 'loony' about you. When you 'try to sell me' the idea that you cannot see me when possible, or if your voice doesn't sound just as loving as I want it to, I feel so badly. . . .

"Oh, it is *so good* to say to myself my big little boy *loves me;* it gives me a nice warm snuggly feeling around my heart. . . . Two dear letters this A. M., I pounced on the first one with joy and the discovery of the second was supremely joyous.

"This morning at ten o'clock I was wishing it was yesterday and that my big, rough, loving, lovable boy was here. I try to imagine myself in your arms, dear, with no disturbing element anywhere, but that is almost too much for even my vivid imagination. . . .

"One lovely paragraph in your letter of yesterday afternoon is adorable when you tell me you are *all mine.* Oh, I hug that close, my own. . . . Why didn't you *give* me the 26 kisses, stead of sending them? Darling, we must go somewhere and *dance,* I want to dance, and am crazy to dance with *you; please* take me dancing. The little handky acts as a vacination or as an hyperdermic preventive. . . .

"Wish you'd be home Saturday afternoon; I don't see why you have to stay over night when it takes only two hours to get home and back to me. . . .

"I'm loving, loving, loving you, my own boy. Your own AMANDA."

"The trip to the game was not quite as you pictured it, dear; I did not wear new coat or hat, wore sealskin coat and *your* sport hat. . . . Mr. and Mrs. D. and I sat together and the 'family' was as far off as possible. All the time I was thinking of my own boy and a number of times found the sky most interesting in order to hold back tears. . . . I wished so often for your long loving arms around me and to hear your voice in anxiety as to my comfort and warmth. . . . I want to answer your precious letter paragraph by paragraph, dear one, but it cannot be done to-day. To-morrow is pretty full, too; take another osteopathic at 4.45 P. M. I do not see how you can help understanding *interior* osteopathy, dear, but anyhow it will not be done till the other has been given a big chance. The idea makes me sick. . . . Be a good boy and always be *sure* that your Amanda loves you always, all ways."

The "family" referred to was her husband.

"You see I *am* jealous, dear, tho' you don't always know it. It has just occurred to me what a poor fish I was last night. . . . I didn't want to leave you and I wanted to touch you even standing in the trolley. I thought of kissing you on Juniper St., but there was some one directly back of us and the street seemed lighter than ever. . . .

"Oh darling, I am *so* glad you are my boy. It is foolish of me to tell you, but when you use the phrase 'please do it for *your boy*,' it sounds so sweet, it sends all sorts of thrills thro and around my heart and I seem to melt all over."

"There is a beautiful paragraph in your letter where you want me always to be your own girl, and want alway to be my Boy and that in your own heart you *are* mine, every *bit* of you."

"Carina is looking booful, and very clean. I gave her your kiss, then took it back for myself."

"Carina" is the name of Mrs. Cook's pet dog.

Objecting to a proposed sea trip by Sommers with several men and women, Mrs. Cook writes:

"If you go I shall be a devil again and Thomasina shall not be permitted in your vicinity. There now."

References to "Thomasina" appear in other letters. When Sommers had been out of town, Mrs. Cook wrote the following:

"Three weeks to-day since I saw you, my boy; I do wish you were here to-day. . . . Sweetheart, keep on loving your girl, she wants you to. '*Miss* Thomasina' has not forgotten, but wonders what has happened. . . . Be good boy, and wrap yourself round with the love of Amanda."

"Well, I am only half awake. . . . I guess my sleepiness is too much bromide which I take at bedtime so I will be sure to sleep. And to tell the truth, dearie, I believe that the bromide has a decided effect on Miss Thomasina; dopes her more than it does me."

Sommers had a dream, of which he informed Mrs. Cook, who then wrote:

"Too bad about the dream; Thomasina is so sorry, but she says it isn't really entirely her fault. It is beautiful to have you love me so, dear one, and the more you do the better I am pleased."

Mrs. Cook was asked the meaning of "Thomasina." She testified it was "a fictitious name," and did not refer to any real person or thing; but she gave no satisfactory explanation of the use of the word, although it appears four times in the letters before us. She stated, however, that it was the female for "Thomas." A short form of that name is not infrequently used to designate, in a vulgar way, the sex organ.

Mrs. Cook, in another letter, writes:

"As for weakness—well, it is the little chap you always have with you that is the instigator of practically all humors; *he* holds the whip and you will *have* to dominate him before you see clearly."

A woman who gives utterances to such sentiments and desires to a man not her husband requires only slight opportunity to complete her degradation. In mind and heart, she is already thoroughly defiled, and all she needs to complete her dishonor is an opportunity to surrender her body to the lustful embrace of her paramour.

It will be recalled that Mrs. Cook, during the period covered by the correspondence, frequently arranged and held clandestine meetings with Sommers in her own home and in the private apartments of Mrs. Paxson. Without the knowledge or consent of the husband, she also, on numerous occasions, took long walks with the co-respondent; visited alone with him various public restaurants, hotels, the dimly-lighted theatre of the moving picture and other places of entertainment; likewise, by prearrangement, she met and was entertained by him in strange cities. Furthermore, Mrs. Cook testified that when she met Sommers, they "talked as foolish as the letters sound;" that he probably kissed her, and that he was apt to touch her.

. This conduct of Mrs. Cook, especially when considered with her letters, shows such an utter disregard of the proprieties of married life that the common observation and experience of mankind cannot reconcile it with any theory other than that she was dominated by adulterous desire during the period covered by the correspondence.

That Sommers was also possessed of adulterous disposition during the same period cannot be doubted; for his clandestine association and correspondence with Mrs. Cook, whom he knew to be a married woman, are not susceptible of any other construction.

The adulterous disposition having been shown to exist between the wife and co-respondent during the period of eight months of their illicit love affair, mere opportunity with comparatively slight circumstances showing guilt will be sufficient to justify the inference that carnal intercourse has actually taken place: Thayer v. Thayer, 101 Mass. 111; Matchin v. Matchin, 6 Pa. 332; Gruninger v. Gruninger, 190 Pa. 633; McCune v. McCune, 31 Pa. Superior Ct. 248; Reighter v. Reighter, 58 Pa. Superior Ct. 636; Hilton v. Hilton, 66 Pa. Superior Ct. 378. Did Mrs. Cook and Sommers have such opportunity?

In the first week of January, 1917, an automobile exhibition was held in New York. This necessitated the presence there of Mr. Cook on business of his concern. His wife desired to visit New York at the time, but he told her he did not wish her to go. She insisted, however, and told him that she would visit Mr. and Mrs. Marks in that city, and he apparently withdrew his objections. The husband traveled to New York on one train and the wife on another on the same day. When she arrived there, she proceeded to the Marks's apartment, and stayed with the Marks family there from three to five days. Her husband called her at that place by telephone, and told her that he was able to secure a room at the Savoy. She could not remember what she said to him during that conversation, but she did say, in testifying, that she does not suppose that she especially invited him to call on her. Before she went to New York, she told Sommers that she was about to visit the Marks family in that city. While she was in the Marks's apartment, Sommers called her by telephone and she told him that she was going to a moving-picture theatre. When she was in the theatre with a Mrs. Van Dorp, he joined her there, and afterwards accompanied her and her friend to Claridge's Hotel for tea, after which the two ladies returned to the Marks's apartment. In the evening of that day, Sommers called at the apartment, the Marks family and others being present. After spending some time there, he accompanied Mrs. Cook to the Ritz-Carlton Terrace, and then to the Golden Glades, after which he brought her back to the Marks home. The next evening, he and Mrs. Cook visited Healey's Hotel, and returned to the Marks residence about eleven o'clock that night. Mrs. Cook testified that, during her visit to New York, she saw the co-respondent on the three separate occasions mentioned during the two days. She also testified that she called him on the telephone about two o'clock in the morning on one of those days. She evidently wanted to see him, but apparently he did not respond to her request. During the time Mrs. Cook was in New York she did not see her husband, and he did not call upon her, nor did he know that Sommers was associating with her in that city.

The co-respondent's testimony as to the New York incident is very meagre and unsatisfactory. Mrs. Cook was the only other witness who testified to her association with him in New York. Her testimony does not disclose who, if any person, accompanied Sommers and herself to the Ritz-Carlton Terrace, the Golden Glades and Healey's Hotel, or what manner of conveyance, if any,

was used to reach those places. Nor does she, a married woman thus associating with a man other than her husband, explain the purpose of those visits or describe what took place after they arrived there. In any event, a conclusion that she spent considerable time, probably hours, alone with Sommers on the visits to the places mentioned would not be unwarranted.

On or about March 17, 1917, Mr. Cook having informed his wife that he was about to go on a business trip to Ohio, she told him that in his absence she would visit her mother at the Hotel Strand, Atlantic City. About the same time she wrote a letter to the co-respondent, in which she stated, among other things, that she was about to visit her mother in Atlantic City, and expressed the hope that she would see him there. She did go to Atlantic City and visit her mother at the Hotel Strand. Sommers arrived there on March 20, 1917, registered at the same hotel, and was assigned to a room on the fourth floor. Mrs. Cook and her mother occupied rooms separate and apart from each other on the third floor of the hotel. After his arrival, Sommers dined with Mrs. Cook and her mother, and then spent the evening with them and one of their friends in a private parlor back of the lobby of the hotel until a reasonable time, when all retired for the night. The next day, Mrs. Cook and Sommers took chair rides with friends, and he left Atlantic City in the afternoon. The visit of Sommers to Mrs. Cook was without the knowledge of her husband.

Sommers's testimony relating to the Atlantic City incident is unsatisfactory because of its almost total lack of detail. He did admit, however, that he visited Mrs. Cook, and was a guest at the Strand Hotel, and that he went to the theatre with her and her mother. Mrs. Cook and Mrs. Kirkpatrick, her mother, were the only other witnesses called who testified to the association of the wife and co-respondent in Atlantic City, and their testimony shows that Mrs. Cook and Sommers were not alone for any considerable time at that place during the waking hours. It will be noted, however, that there is no evidence that the mother and daughter slept in the same room. They occupied rooms not connected with each other on the third floor, and Sommers's room was on the floor above. The mother did not pretend to testify as to the whereabouts of Sommers or her daughter during the sleeping hours. Mrs. Cook was the only witness to testify that she was not alone with the co-respondent in any room during his stay in Atlantic City.

In large cities, ample opportunities exist for the commission of sexual offences by clandestine lovers. The large hotels and apartment-houses, automobiles, and the still extant house of assignation, afford ready facilities for the adulterous to commit the offence without any appreciable fear of detection. That such general opportunity was at hand when Mrs. Cook and Sommers associated on numerous occasions, during a period of eight months, in Philadelphia, New York and Atlantic City, cannot be doubted.

Mrs. Cook has failed to explain the purpose of her visits to, or what transpired while she and Sommers were in, the hotels in New York. Under the circumstances, she should not complain if we cannot reconcile those visits with innocence. If we assume for the present that the wife and the co-respondent were of adulterous disposition while in New York, they not only had the general opportunities existing in large cities for the commission of the offence, but when in the hotels opportunity was knocking at their door. Furthermore, if, in Atlantic City, they were possessed of adulterous disposition, they slept in the same hotel at night. We gather from the evidence that the wife had rooms unconnected with those of her mother on the third floor, and it is fair to assume that the mother would use her own room for

Cook *v.* Cook.

sleeping purposes. Sommers had a separate room on the fourth floor. While Mrs. Cook denies that she was at any time alone in a room with Sommers at Atlantic City, and the evidence shows that during waking hours they were not alone with each other for any considerable time, nevertheless, during the hours usually devoted to sleep, the wife and co-respondent, each occupying a separate room alone, were not without opportunity, slight though it may have been, to meet secretly in either chamber, if adulterous desire dominated.

It may be contended that opportunity of the character shown to have been at hand to the wife and co-respondent while they were in the City of New York and Atlantic City is not the opportunity intended by law, when a charge of adultery is under consideration. This contention may not be without force, but we deem it unnecessary to express an opinion thereon, since we do not rest our findings of opportunity on the New York or Atlantic City incidents alone; for we are convinced that Mrs. Cook and Sommers met between September, 1916, and May, 1917, in at least two apartment-houses in Philadelphia, with specific opportunity of such nature that the guarded discretion of a reasonable and just man could not conclude other than that the time, the place, the circumstances and the man and woman had concurred; and if the two persons were possessed of adulterous desire and the will, everything was then ready for the immediate commission of the offence.

Mrs. Cook testified that she and Sommers visited the apartment of Mrs. Paxson on two afternoons and once in the evening, and that they were together in that place for an hour or so on each occasion. The apartment consisted of two rooms and a bath. Mrs. Paxson was a widow, without children, and did not have servants. During the visits of the wife and the co-respondent to the apartment, Mrs. Paxson was the only other person there, and was always in their presence, except when she was absent for "minutes" in the adjoining room. Mrs. Paxson knew full well that Mrs. Cook was a married woman living with her husband in the Hamilton Court. She also knew that Sommers was the lover and not the husband of Mrs. Cook. Knowing all this, she, nevertheless, permitted her apartment to be made a rendezvous for the wife and the co-respondent, and encouraged the continuance of the relations existing between her two visitors by acting as intermediary for the transmission of Sommers's love missives to Mrs. Cook, so that their intimacy might not become known to the husband.

The relations thus shown to have existed between the three persons establish beyond doubt that Mrs. Paxson was a confidante, confederate and a facile tool of the wife and co-respondent in their irregular love affair; and the moral obliquity of Mrs. Paxson, thus evidenced, was entirely consistent with a disposition on her part to connive at opportunity to Mrs. Cook and Sommers when they were in her apartments. We can readily understand, under the circumstances, that the presence of Mrs. Paxson, the confidante and confederate, in one room of the apartment would not, to any appreciable degree, interfere with Mrs. Cook and Sommers committing the sexual offence while they were in the adjoining room. That Mrs. Paxson was actually absent for "minutes" at times, in one room, while the wife and the co-respondent were in another is admitted by Mrs. Cook in her testimony. We are not given to understand, however, just what length of time Mrs. Cook intended by the use of the word "minutes." We must consider, nevertheless, that she is a party to the suit, and her testimony must be viewed in the light of her interest, and, so viewed, Mrs. Cook would probably minimize the time of Mrs. Paxson's absence by the use of the indefinite word "minutes." Literally, that word would mean any time from two minutes to an hour. Furthermore, we must

Cook *v.* Cook.

have in mind that Mrs. Cook was a married woman in clandestine meeting with a man with whom she was in a correspondence of love, and that, to such a woman, a long time would seem but as a minute in his company. It is only natural that she would, when telling her story, use, in describing time, language favorable to an innocent construction of her irregular association with Sommers. When, however, we consider the peculiar relations existing between Mrs. Paxson, Mrs. Cook and Sommers, as well as the circumstances under which the wife used the word "minutes," and then apply the test of hard common sense, we cannot believe other than that the absences of Mrs. Paxson from the room in which the wife and the co-respondent were alone were for at least a sufficient number of minutes to afford Mrs. Cook and Sommers the opportunity to indulge in the sexual offence, if they were so inclined.

The Cook apartments in Hamilton Court were reached by entering a gateway on Chestnut Street, passing southwardly through a courtyard a distance of seventy-five feet to the second entrance into the building, then ascending a stairway to the second story landing. There a door opened into the apartments, which consisted of a living-room, two bedrooms, a bath-room, dining-room, pantry and kitchen. The precise location of the rooms is not made clear by the testimony, but as nearly as we can ascertain therefrom they extend in the order named from the landing in the front to the kitchen in the extreme rear. The rooms, on their western side, faced the court; along their eastern side was the private hallway of the apartments.

Mrs. Cook testified that Sommers, in the early part of their renewed friendship, had asked permission to call at her apartment in Hamilton Court when he would be on his way to work in the mornings. She admits that thereafter, during the period between September, 1916, and May, 1917, he did visit her there six times in the mornings, generally at ten o'clock, and on each occasion in the absence of her husband and without his knowledge or consent.

From September, 1916, to May, 1917, Mrs. Cook had one servant, Mrs. Anna Brown, a colored woman, who did not sleep in the apartment, but was in attendance there every day between 7.30 o'clock in the morning and half-past eight or nine o'clock in the evening, excepting one afternoon during the week and the afternoon of every other Sunday. Mrs. Brown testified that she admitted Sommers to the apartment two or three times a week during the period just mentioned. Her memory as to the number of visits may be inaccurate; but accepting, as we do, Mrs. Cook's testimony in that regard, he did visit the apartments on no less than six occasions, and for as long as an hour at a time. After admitting Sommers and conducting him to the room designated by her mistress, they were there left alone by the maid, who returned to her household duties in the kitchen. She did not remember thereafter entering any room occupied by Mrs. Cook and Sommers, nor did she disturb their privacy, unless it was "special to ask a question or something."

The maid testified that on at least two occasions she ushered Sommers into the bedroom, where Mrs. Cook, who may have been slightly ill, was undressed and lying in bed, close to the head of which he seated himself. Thereupon she returned to her household work in the kitchen. This testimony has not been specifically denied or explained by Mrs. Cook, who, however, did say that she entertained Sommers in the living-room on the occasions of his visits.

The maid also testified that she was generally occupied in the kitchen, from which place she could not see into the bedrooms or living-room. In order to do so, it was necessary that she walk along the hallway. From her testimony, it does not appear that she ever saw anything that transpired in the room occupied by her mistress and Sommers after she left them alone.

Other than Mrs. Cook and Sommers, the maid was the only person in the apartments during his visits. However, she was not at all times present; for it appears that Mrs. Cook and the maid both testified unequivocally that the latter sometimes went to the market, thus leaving her mistress and Sommers alone in the apartments.

The maid could not tell with any appreciable degree of certainty the length of Sommers's visits, because she was usually engaged in her household work in the kitchen, and, therefore, never saw him leave except on one occasion in the afternoon, when she observed him standing at the front door after he had been in the apartments for a long time.

From the testimony just reviewed, there can be no doubt that the time and place selected by the wife and co-respondent for their clandestine meetings in Hamilton Court were opportune. It was reasonably anticipated that the husband would be absent, and he was absent on each of Sommers's visits there. Mrs. Cook knew that the only other person in the apartments would be the maid, who would be engaged in her household work, for at least no inconsiderable part of the time, in the kitchen, from which distant room she could not see, and in fact never did see, anything transpire in the front rooms where Mrs. Cook and Sommers were alone; and it must have been known to both of them that the maid would leave for the market contemporaneously with his visit, and she did so on several occasions. The wife and the co-respondent had, therefore, more than slight opportunity to indulge their adulterous desire without any appreciable fear of detection, when the maid was at her work in the kitchen; and on the occasions of Sommers's visits, when the maid left for market, they were absolutely alone, unrestrained by any fear that might possibly arise had a third person been present, and they then had the fullest opportunity to commit adultery.

The clandestine arrangements to bring about available opportunities in the apartments, and the secret correspondence between the parties contemporaneous with Sommers's visits there, considered alone or in connection with their many meetings outside of Hamilton Court, convince us that they were both possessed of adulterous desire when they met in the apartment. Furthermore, the circumstances attending the meetings there, especially on the occasions when Sommers remained alone in the room with Mrs. Cook while she was lying undressed in bed, cannot be reconciled with innocence.

Colt, J., in Thayer v. Thayer, 101 Mass. 113, said: "When adulterous disposition is shown to exist between the parties at the time of the alleged act, then mere opportunity, with comparatively slight circumstances showing guilt, will be sufficient to justify the inference that criminal intercourse had actually taken place."

It is true that Mrs. Cook denies that she ever committed adultery with Sommers. The co-respondent did not deny the commission of the offence with her, nor did he admit it, when he was on the stand, but declined to testify in that regard because it might embarrass him. When persons have created opportunities for the commission of adultery and have conducted themselves in a manner inconsistent with their innocence, courts are justified in drawing the inference that such opportunities were improved, notwithstanding their denials of guilt: Dunham v. Dunham, 162 Ill. 589; Matchin v. Matchin, 6 Pa. 332; Gruninger v. Gruninger, 190 Pa. 633; McCune v. McCune, 31 Pa. Superior Ct. 248; Reighter v. Reighter, 58 Pa. Superior Ct. 636; Hilton v. Hilton, 66 Pa. Superior Ct. 378.

After careful consideration of all the evidence, we are of opinion that the wife and her paramour were possessed of adulterous disposition during the

Cook v. Cook.

period extending from September, 1916, to May, 1917, and that such disposition concurred with frequent opportunity for criminal intercourse, under circumstances which lead irresistibly to the conclusion that adultery was committed as charged in the husband's libel. The husband was, therefore, justified in his separation from the wife on May 30, 1917, and her libel for divorce *a mensa et thoro* is dismissed. The husband is entitled to a decree of divorce *a vinculo matrimonii*.

The exceptions to the master's report numbered 1, 2, 6, 12, 15, 16, 18, 19, 21 and 22 are dismissed. The exceptions numbered 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, 17, 20, 23, 24, 25 and 26 are sustained.